# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE KRAFT HEINZ DEMAND
REFUSED DERIVATIVE
STOCKHOLDER LITIGATION

)
) CONSOLIDATED
) C.A. No. 2022-0398-LWW

## MEMORANDUM OPINION

Date Submitted: April 10, 2024
Date Decided: July 19, 2024

Carmella P. Keener, COOCH & TAYLOR, P.A., Wilmington, Delaware; P. Bradford deLeeuw, DELEEUW LAW LLC, Wilmington, Delaware; Benjamin Kaufman & Patrick Donovan, WOLF HALDENSTEIN FREEMAN & HERZ LLP, New York, New York; Michael Hynes & Ligaya Hernandez, HYNES & HERNANDEZ LLC, Malvern, Pennsylvania; Robert C. Schubert & Willem F. Jonckheer, SCHUBERT JONCKHEER & KOLBE LLP, San Francisco, California; Richard D. Greenfield, Marguerite R. Goodman & Ann M. Caldweel, GREENFIELD & GOODMAN LLC, Philadelphia, Pennsylvania; Fred T. Isquith, Sr., ISQUITH LAW PLLC, New York, New York; *Counsel for Plaintiffs*

Matthew D. Stachel, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Daniel J. Kramer, Andrew J. Ehrlich & William A. Clareman, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York; *Counsel for Nominal Defendant The Kraft Heinz Company and the Individual Defendants*

Michael A. Pittenger, Jacqueline A. Rogers & Caneel Radinson-Blasucci, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Sandra C. Goldstein, Stefan Atkinson & Kevin M. Neylan, Jr., KIRKLAND & ELLIS LLP, New York, New York; *Counsel for Defendants 3G Capital, Inc., 3G Capital Partners Ltd., 3G Capital Partners II LP, 3G Global Food Holdings GP LP, 3G Global Food Holdings LP, and HK3 18 LP*

**WILL, Vice Chancellor**

In August 2018, 3G Capital Inc. sold a portion of its ownership interest in The Kraft Heinz Company. Six months later, Kraft Heinz announced a $15.4 billion impairment charge. The plaintiffs in this case contend that 3G's stock sale occurred based on material non-public information while Kraft Heinz officers and directors concealed the looming impairment from the market.

These facts may sound familiar to the reader. I addressed them in a prior decision that dismissed a derivative suit for failure to plead demand futility. The present action is the demand-made iteration. The three plaintiffs here each sent the Kraft Heinz board litigation demands about 3G's stock sale and impairment-related disclosures.

The board of Kraft Heinz formed an administrative working group of two directors to consider the demands. The working group hired independent legal counsel and a forensic accountant to assist with its investigation. It and its advisors reviewed more than 150,000 documents, interviewed a dozen people, and considered a detailed prior investigation led by outside counsel. After a two-year process, the working group authored a 110-page report summarizing its analysis. It recommended that the demands be rejected, and the full board agreed.

The plaintiffs spurn the board's conclusions and allege that the demands were wrongfully refused. In assessing their arguments, I need not resolve whether Kraft Heinz fiduciaries made material misstatements to the market or whether 3G engaged

1

in insider trading. The board of Kraft Heinz probed these matters and concluded that it was not in the company's interest to pursue litigation about them. Instead, I must consider whether the plaintiffs have pleaded particularized facts creating a reasonable doubt that the board investigated and rejected the demands in good faith and with due care. The complaint lacks any such allegations.

The plaintiffs argue that the working group was "structurally flawed" based both on its mandate and its membership. Their belief that the board should have empowered the working group with final decision-making authority is at odds with their tacit concession of the board's impartiality. And their concerns about the working group including a director who chaired the Audit Committee during the challenged events are meaningless, given the dearth of well-pleaded allegations that he faced a substantial likelihood of liability.

The plaintiffs also make a series of complaints about the findings and recommendations in the working group's report. They amount to unsupported disagreements. None indicate that the board's refusal of the demands amounts to a breach of fiduciary duty.

The case is dismissed under Court of Chancery Rule 23.1.

# I. BACKGROUND

The following background is drawn from the Consolidated Verified Derivative Complaint (the "Complaint") and the documents it incorporates by reference.[1]

## A. The Formation of Kraft Heinz

Defendant 3G Capital, Inc. is a private investment firm.[2] In 2013, it and Berkshire Hathaway, Inc. acquired The H.J. Heinz Company ("Heinz").[3] Two years later, Heinz merged with Kraft Food Groups, Inc. ("Kraft") to form nominal defendant The Kraft Heinz Company.[4] Kraft Heinz—a Delaware corporation—is one of the world's largest food and beverage companies.[5]

3G owned 24% of the combined entity's shares and Berkshire Hathaway owned 27%.[6] Each was entitled to appoint directors to Kraft Heinz's Board of

---

[1] Consol. Verified Deriv. Compl. (Dkt. 49) ("Compl."); *see In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170-71 (Del. 2006); *Allen v. Encore Energy P'rs*, 72 A.3d 93, 96 n.2 (Del. 2013). The books and records produced in response to the plaintiffs' demands under 8 *Del. C.* § 220 are deemed incorporated into the complaint. *See* Compl. 2; *see also Reiter ex rel. Cap. One Fin. Corp. v. Fairbank*, 2016 WL 6081823, at *2, 5-6, 9 (Del. Ch. Oct. 18, 2016) (considering documents incorporated by reference under agreements governing stockholder inspection demands).

[2] Compl. ¶ 64.

[3] *Id.* ¶ 83.

[4] *Id.* ¶ 2.

[5] *Id.* ¶ 71.

[6] *See id.* ¶ 83; *see also In re Kraft Heinz Co. Deriv. Litig.*, 2021 WL 6012632, at *6 (Del. Ch. Dec. 15, 2021), *aff'd*, 282 A.3d 1054 (Del. 2022) (TABLE).

Directors.  During the time period relevant to this case, Kraft Heinz had an 11-person Board.  Five members were selected by Kraft, three by Berkshire Hathaway, and three by 3G.[7]

Alexandre Behring, Jorge Paulo Lemann, and Marcel Herrmann Telles were 3G's Board appointees.[8]  The Board appointed 3G partners Bernardo Hees as Chief Executive Officer and Paulo Basilio as Chief Financial Officer.[9]  Basilio was later reassigned as Zone President of U.S. Business and 3G partner David Knopf became Kraft Heinz's CFO.[10]

### B.  Kraft Heinz's Performance

After the merger of Kraft and Heinz closed, management implemented cost-cutting measures.[11]  These measures allegedly reduced product quality, damaged customer relationships, and caused supply chain problems.[12]  Short-term positive financial results followed, allegedly at the expense of Kraft Heinz's long-term outlook and asset value.[13]

---

[7] Compl. ¶¶ 84-86.

[8] *Id.* ¶ 86.

[9] *Id.* ¶¶ 86-87.

[10] *Id.* ¶ 87.

[11] *Id.* ¶¶ 3-4, 23-24, 94, 100, 105, 115-19, 129, 139, 318.

[12] *Id.* ¶¶ 3-4, 13, 25, 95, 100-02, 108, 111-13, 128, 130-32, 139, 143-45, 148, 155, 157, 177, 197, 200-21.

[13] *Id.* ¶ 4.

By April 2018, Kraft Heinz senior management purportedly knew that key reporting units, trademarks, and brands were struggling.[14] According to the Complaint, they optimistically projected the value of essential business units, trademarks, and brands while avoiding the threshold for the early warning disclosure on impairment.[15] Within weeks of an April 1 impairment analysis, EBITDA projections were revised downward.[16]

On July 13, 2018, the Securities and Exchange Commission sent Kraft Heinz a document preservation request about procurement and impairment-related issues.[17] Kraft Heinz's Audit Committee members were informed of the investigation during a meeting two weeks later.[18] Meeting attendees—including Knopf and Audit Committee Chairman John C. Pope—were also allegedly told that certain business units, trademarks, and brands were on the verge of the early warning disclosure threshold.[19]

---

[14] *Id.* ¶ 5.

[15] *Id.* ¶¶ 5, 6, 8, 14-15, 17, 20, 25, 30, 86, 135, 145-62, 187, 206, 306-07, 317.

[16] *Id.* ¶¶ 17, 151, 160, 185, 288.

[17] *Id.* ¶ 188; *see* Compl. Ex. J (Report of the Working Group of the Board of Directors of The Kraft Heinz Company) ("Report"). The Report is expressly incorporated by reference into the Complaint.

[18] Compl. ¶ 188.

[19] *Id.*; *see also id.* ¶¶ 8, 152-53, 183, 188 n.22.

## C. The 3G Stock Sale

On August 3, 2018, Kraft Heinz filed a Form 10-Q with the SEC that disclosed the company's annual impairment testing. An earnings call was held the same day.[20] Management reported that temporary "negative headwinds" were affecting the business.[21] The company did not address any worsening problems with business units, trademarks, or brands caused by cost-cutting.[22] Nor did it say that it was approaching an impairment of Kraft Heinz's goodwill and intangible assets.[23]

On August 7, 3G sold 20.3 million shares of Kraft Heinz stock for proceeds exceeding $1.2 billion.[24] The sale represented approximately 7% of 3G's ownership in Kraft Heinz.[25] It was timed to coincide with the expiration of an insider selling blackout period and a lockup period.[26]

---

[20] *Id.* ¶ 11.

[21] *Id.* ¶¶ 11-12.

[22] *Id.* ¶¶ 5-6, 8, 10-12, 14-15, 17, 20, 25, 30, 86, 144-62, 187, 206, 208, 231, 317.

[23] *Id.* ¶¶ 24, 99, 171.

[24] *Id.* ¶ 13.

[25] Transmittal Aff. of Michael A. Pittenger to the 3G Defs.' Opening Br. in Supp. of Their Mot. to Dismiss the Consol. Verified Deriv. Compl. (Dkts. 68, 70, 72) ("Pittenger Aff.") Ex. 21.

[26] Compl. ¶¶ 146, 187, 190, 198, 291, 305.

6

## D. The Subpoena

In October 2018, the SEC served Kraft Heinz with a subpoena about procurement practices.[27]  Soon after, Kraft Heinz amended its policy on "Accounting for Intangible Assets and Goodwill."[28]  The policy change removed subjectivity from the impairment analysis process.

On November 1, Kraft Heinz reported financial results for the third quarter of 2018.  It disclosed a $499 million impairment to the value of certain brands and goodwill.[29]  Management maintained that internal controls were effective and no problems with the impairment status of the company's foundational business units, trademarks, or brands were disclosed.[30]

On December 5, Kraft Heinz's outside auditor delivered its final 2018 annual impairment analysis.[31]  In late December, Kraft Heinz recognized a triggering event—a sustained decline in its stock price since the November 1 earnings release—and ran an interim impairment analysis.  Revised projections were used to target the business units, trademarks, and brands for which the company had not

---

[27] *Id.* ¶ 191.

[28] *Id.* ¶ 192.

[29] *Id.* ¶ 16.

[30] *Id.* ¶¶ 16-17.

[31] *Id.* ¶¶ 182, 187, 194, 310.

issued early warning disclosures or recognized an impairment.[32]  Kraft Heinz's stock price continued to fall.[33]

### E.    The Impairment

On February 21, 2019, Kraft Heinz released its 2018 fourth quarter earnings report and announced a $15.4 billion non-cash impairment to its goodwill and intangible assets.[34]  This reduced the company's reported net income to an annual loss of $10.3 billion.[35]  The write-down was tied to impairments in the carrying amount of goodwill in five reporting units and five brands.[36]  Kraft Heinz's stock price dropped 27.5%.[37]

One week later, Kraft Heinz disclosed the receipt of the October 2018 SEC subpoena.[38]  It also announced that it would delay filing its Form 10-K for the 2018 fiscal year while the Audit Committee oversaw an internal investigation into the company's procurement function.

---

[32] *Id.* ¶¶ 195-96.

[33] *Id.* ¶ 196.

[34] *Id.* ¶ 202; *see* Pittenger Aff. Ex. 28.

[35] Compl. ¶¶ 18, 202.

[36] *Id.* ¶ 202; *see* Pittenger Aff. Ex. 29.

[37] Compl. ¶ 205.

[38] *Id.* ¶ 209; *see* Pittenger Aff. Ex. 29.

On May 6, 2019, Kraft Heinz reported that the investigation was substantially complete.[39] Kraft Heinz restated its financial statements from 2015 to 2018 to reflect $208 million in cumulative increases to its previously reported $63.7 billion in cost of products sold during that time.[40] Kraft Heinz also disclosed a revision to its February 2019 write-down, which resulted in an additional impairment loss of approximately $105 million.[41]

### F.     Subsequent Litigation

An array of lawsuits came on the heels of Kraft Heinz's restatement announcement.

In February 2019, a federal securities class action was filed in the United States District Court for the Northern District of Illinois.[42] The plaintiff alleged that certain Kraft Heinz officers and directors committed securities fraud and that 3G's August 2018 stock sale was insider trading. The federal court sustained claims for securities law violations against Kraft Heinz, Hees, Basilio, Knopf, Behring, and 3G, as well as former Kraft Heinz director George Zoghbi and Executive Vice President

---

[39] Compl. ¶ 212; Pittenger Aff. Ex. 30.

[40] Compl. ¶¶ 22, 212; *see* Pittenger Aff. Ex. 30.

[41] Compl. ¶ 214.

[42] *See Hedick v. The Kraft Heinz Co., et al.*, C.A. No. 1:19-cv-01339 (N.D. Ill.).

and President, International Markets Rafael Oliveira.[43]  The parties reached a settlement for $450 million.[44]

Beginning in July 2019, derivative lawsuits were filed in this court.  The plaintiffs claimed that 3G, entities affiliated with it, and certain dual fiduciaries of 3G and Kraft Heinz breached their fiduciary duties in connection with 3G's stock sale.  They alleged that demand on the Kraft Heinz Board was excused.  The cases were consolidated and dismissed for failure to plead demand futility.[45]  The Delaware Supreme Court affirmed the dismissal.[46]

Despite Kraft Heinz's Delaware forum selection bylaw, another derivative suit was filed in the Northern District of Illinois in July 2019.[47]  The suit was nearly identical to those filed in this court and alleged demand futility.  The federal court granted a motion to dismiss on June 5, 2023, holding that a majority of the Board did not face a substantial likelihood of personal liability.[48]

---

[43] Compl. ¶¶ 223-24, 227-28.

[44] *Id.* ¶ 29; *see* Transmittal Aff. of Matthew D. Stachel in Supp. of the Opening Br. in Supp. of Nominal Def.'s and the Individual Defs.' Mot. to Dismiss under Rules 23.1 and 12(b)(6) (Dkt. 66) ("Stachel Aff.") Ex. 1.

[45] *Kraft Heinz*, 2021 WL 6012632.

[46] *Kraft Heinz*, 282 A.3d 1054.

[47] *In re Kraft Heinz S'holder Deriv. Litig.*, C.A. No. 1:20-cv-2259 (N.D. Ill.).

[48] *In re Kraft Heinz S'holder Deriv. Litig.*, 2023 WL 2745118, at *1 (N.D. Ill. Mar. 31, 2023).

## G. The Demands

Between May 22, 2019 and October 7, 2021, the plaintiffs here—Stephen Datnoff, Judy Mesirov, and Adriana D. Felicetti—sent litigation demands to the Board.[49] The letters asked the Board to investigate potential wrongdoing by 3G, 3G affiliates, and current and former directors and officers of Kraft Heinz.

The demands alleged that certain Kraft Heinz fiduciaries had made false statements about the company's financial state and failed to oversee financial disclosure and reporting internal controls, including cost-cutting. They also accused Kraft Heinz of overstating the value of goodwill and intangible assets before the February 2019 impairment disclosure. They maintained that the defendants were involved in procurement-related accounting misconduct, which was the subject of a prior internal investigation. And they alleged that 3G sold stock based on material non-public information about the impending impairment charge.

## H. The Working Group

The Board launched an investigation in response to the demands. On April 29, 2020, it created an administrative working group (the "Working Group") of two outside directors: Pope and Susan Mulder.[50] Mulder had been appointed to the

---

[49] Compl. ¶¶ 252-54, 262, 264-65; *see* Report 29. Two other purported stockholders also served demands. *See id.*

[50] Compl. ¶ 279. The Working Group was formed after the Mesirov demand was received in the first quarter of 2020. *See* Report 2 n.1.

Board in May 2020, after the challenged events.[51] Pope is a former Kraft director and has served on the Kraft Heinz Board since July 2015.[52] The plaintiffs in the Delaware derivative litigation did not challenge Pope's disinterestedness or independence.[53] In the federal derivative suit, the court found that allegations about Pope failed to demonstrate that he faced a substantial likelihood of liability.[54]

The Working Group was charged with evaluating the allegations in the demands and recommending an appropriate response to the Board.[55] It retained legal advisors at Simpson Thacher & Bartlett LLP and Young Conaway Stargatt & Taylor, LLP.[56] Simpson Thacher retained AlixPartners LLP to serve as the Working Group's forensic accounting advisor.[57]

After a two-year process, the Working Group concluded that it was not in Kraft Heinz's best interest to pursue litigation based on the issues raised in the demands. With the "potential exception" of two Kraft Heinz executives—Eduardo Pelleissone and Klaus Hofmann—who were subjects of "more colorable"

---

[51] *Id.*; *see* Report 49-50.

[52] Compl. ¶¶ 56, 279.

[53] *Kraft Heinz,* 2021 WL 6012632, at *5 ("The plaintiffs . . . concede that Jackson and Pope are independent and disinterested for purposes of a demand futility analysis.").

[54] *Kraft Heinz*, 2023 WL 2745118, at *9.

[55] Compl. ¶ 279; *see* Report 51.

[56] Compl. ¶ 262, *see* Report 4, 50.

[57] Report 50.

allegations, the Working Group identified no evidence that applicable law had been violated. Even as to Pelleissone and Hofmann, the Working Group concluded that litigation was imprudent based on practical considerations. These conclusions and the Working Group's findings were memorialized in a 110-page Report of the Working Group of the Board of Directors of the Kraft Heinz Company, dated April 12, 2022 (the "Report").[58]

On April 21, 2022, the Working Group reported to the Board that it believed litigation on the subjects raised in the demands was unwarranted. It recommended that the demands be denied.[59] The Board accepted the Working Group's recommendation and rejected the demands.[60]

## I.     This Litigation

On May 6, 2022, the present derivative action was filed in this court by Datnoff, Mesirov, and a third stockholder who later withdrew as a party.[61] On November 18, 2022, the plaintiffs filed an amended complaint.[62] On March 6, 2023, Felicetti filed a separate derivative complaint.[63]

---

[58] Compl. Ex. J.

[59] Compl. ¶ 269; Stachel Aff. Ex. 4.

[60] Compl. ¶ 271; Stachel Aff. Ex. 4.

[61] Dkt. 1.

[62] Dkt. 14.

[63] *Felicetti v. Behring*, C.A. No. 2023-0278-LWW (Dkt. 1) (Del. Ch. Mar. 6, 2023).

The two cases were consolidated on April 24, 2023.[64] The operative consolidated Complaint was filed on May 18, 2023. In it, the plaintiffs allege that their demands were wrongfully refused. They seek to assert derivative *Brophy* and aiding and abetting claims against 3G—the same claims raised in the prior demand futility actions.[65] They also wish to advance *Caremark* and *Malone* breach of fiduciary duty claims and an unjust enrichment claim against the individual defendants.[66]

The defendants moved to dismiss the Complaint on July 24, 2023.[67] On September 22, 2023, the plaintiffs filed a brief in opposition to the defendants' motions to dismiss.[68] The defendants filed reply briefs in further support of their motions on November 3, 2023.[69] Oral argument was held on April 2, 2024 and the parties filed letters identifying additional authority on April 8 and 10.[70]

---

[64] Dkt. 47.

[65] Compl. ¶¶ 350-64; *see Kraft Heinz*, 2021 WL 6012632, at *4.

[66] Compl. ¶¶ 334-41, 366-67. They also bring an indemnification and contribution claim. *Id.* ¶¶ 342-49.

[67] Dkts. 65, 67.

[68] Pls.' Omnibus Br. in Opp'n to Defs.' Mots. to Dismiss (Dkt. 82) ("Pls.' Answering Br.").

[69] Dkts. 87, 88.

[70] Dkts. 101, 103-04.

## II. ANALYSIS

It is a "cardinal precept" of Delaware law that "directors, rather than shareholders, manage the business and affairs of the corporation."[71] "The decision to bring a law suit or refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation."[72] A stockholder may only assume the power to bring a derivative claim on the corporation's behalf after satisfying the strict conditions of Rule 23.1.[73] A board's rejection of a litigation demand is entitled to the protections of the business judgment rule, which presumes that the directors acted in good faith and on an informed basis.[74]

The plaintiffs bear the heavy burden of pleading "particularized facts which, taken as true, raise a reasonable doubt that the refusal was a valid exercise of business judgment."[75] These "stringent requirements of factual particularity . . .

---

[71] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[72] *Spiegel v. Buntrock*, 571 A.2d 767, 73 (Del. 1990)

[73] *See White v. Panic*, 783 A.2d 543, 546-47 (Del. 2001) (explaining that the demand requirement of Rule 23.1 "implement[s] the principle that the cause of action belongs to the corporation").

[74] *See Aronson*, 473 A.2d at 812; *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996) ("After investing the time and resources to consider and decide whether or not to take action in response to the demand, the Board is entitled to have its decision analyzed under the business judgment rule unless the presumption of that rule can be rebutted."), *overruled on other grounds by Brehm*, 746 A.2d 244.

[75] *Ironworkers Dist. Council of Phila. & Vicinity Ret. & Pension Plan v. Andreotti*, 2015 WL 2270673, at *26 (Del. Ch. May 8, 2015), *aff'd*, 132 A.3d 748 (Del. 2016).

differ substantially from" the notice pleading standard of Rule 8(a).[76] "Vague or conclusory allegations do not suffice" and the court will neither "blindly accept as true all allegations" nor draw unreasonable inferences in the plaintiffs' favor.[77]

## A. The Plaintiffs' Tacit Concessions

By making a demand, the plaintiffs "waived any claim they might otherwise have had that" the Board as then constituted "cannot act independently on the demand."[78] Their demands "place[d] control of the derivative litigation in the hands of the board of directors."[79] Although the Complaint nevertheless contested the directors' independence and disinterestedness, the plaintiffs have since acknowledged that they tacitly conceded the Board as a whole could impartially consider the demands.[80]

---

[76] *Brehm*, 746 A.2d at 254.

[77] *Ironworkers*, 2015 WL 2270673, at *25 (citation omitted); *see also Brehm*, 746 A.2d at 255 ("[C]onclusory allegations are not considered as expressly pleaded facts or factual inferences.").

[78] *Scattered Corp. v. Chi. Stock Exch., Inc.*, 701 A.2d 70, 74 (Del. 1997), *overruled on other grounds by Brehm*, 746 A.2d 244; *see also Thorpe v. CERBCO, Inc.*, 611 A.2d 5, 10 (Del. Ch. 1991) (explaining that by making a demand, the plaintiff "made an important concession: that the board is able to function on the question" of whether claims should be pursued).

[79] *Spiegel*, 571 A.2d at 775.

[80] *See* Compl. ¶¶ 284-85; Tr. of Oral Arg. on Defs.' Mots. to Dismiss (Dkt. 104) ("Hr'g Tr.") 37 (The Court: "You're not refuting that you tacitly conceded that the board as a whole could consider the demand impartially; is that right?" Counsel: "Yes, that is correct." The Court: "You're focused solely on Mr. Pope." Counsel: "We are focused solely on Mr. Pope."). The plaintiffs' answering brief does not argue that a majority of the Board was conflicted either at the time the demands were made or when the demands were refused.

16

Even if the plaintiffs had not abandoned their argument that the Board was biased, it would fail. The purported conflicts raised in the Complaint—that the directors were involved in the challenged events, named as defendants in the federal derivative complaint, or have ties to 3G—were known when the first demand was made by Mesirov in May 2019.[81] By opting to serve demands rather than file demand excused suits, the plaintiffs conceded that at least six of the eleven directors *ex ante* could impartially act on a demand.[82]

The Board membership changed between the making of the first demand in 2019 and the rejection of the demands in 2022, with six directors turning over and five remaining.[83] The purported conflicts affecting the recomposed Board are, however, either the same as or weaker than those allegedly existing when the first demand was made.[84] The new directors were neither named in the federal suits nor

---

*See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[81] *See* Compl. ¶¶ 284-85; Stachel Aff. Ex. 6 ¶¶ 16, 19-28.

[82] *See FLI Deep Marine LLC v. McKim*, 2009 WL 1204363, at *3 (Del. Ch. Apr. 21, 2009) (reasoning, in the wrongful refusal context, that it would be inappropriate to "part ways with established Delaware law to grant the Plaintiffs relief from a strategic decision they now regret").

[83] Compl. ¶ 284.

[84] As discussed below, a number of new directors joined the Board between the time Mesirov made her demand and when Datnoff and Felicetti made their demands (and Mesirov made a supplemental demand). *See infra* notes 88-91 and accompanying text; *see also* Report 29; Compl. ¶¶ 252, 261, 264-65. The plaintiffs neglect to address the import of the director turnover relative to their respective demands.

involved in the events raised in the demands. There are no changed circumstances pleaded between the time of the demands and the Board's refusal of the demands that would put in doubt the independence or disinterestedness of a majority of these directors.[85]

The best the plaintiffs can muster is to insinuate that the Board as comprised in 2022 was dominated by 3G, which they argue was a controlling stockholder.[86] That argument is without factual or legal support. During the relevant period, 3G was Kraft Heinz's second largest stockholder (after Berkshire Hathaway) with less than a quarter of the company's stock.[87] It lacked the ability to control the Kraft Heinz Board and appointed just three of the Board's eleven directors.

---

[85] *See Andersen v. Mattel, Inc.*, 2017 WL 218913, at *5 (Del. Ch. Jan. 19, 2017) (holding a plaintiff to his tacit concession where he "ha[d] not pled any facts suggesting that the board became interested or beholden" to an interested party); *see also FLI Deep Marine*, 2009 WL 1204363, at *3 (rejecting the plaintiffs' attempt to avoid their concession where they "maintain[ed] the Board lacked independence since at least the time of their demand"); *Ironworkers*, 2015 WL 2270673, at *32 (noting that the plaintiff had conceded that the board at the time of the demands could consider a demand and did "not challenge, *ex post*, the Board's interest or independence"). In fact, the federal court rejected similar allegations against the directors after the demands were made. *See Kraft Heinz*, 2023 WL 2745118, at *6-9.

[86] *See, e.g.*, Compl. ¶¶ 1, 173, 282, 284-85, 287, 293, 303.

[87] *See supra* note 6 and accompanying text. The plaintiffs argue that a company's second-largest stockholder can be deemed controlling based on the Court of Chancery's decision in *Williamson v. Cox Communications, Inc.* 2006 WL 1586375, at *5-6 (Del. Ch. June 5, 2006); *see* Pls.' Answering Br. 59; Dkt. 101. That case does not aid them. In *Williamson*, the court considered whether it was reasonably conceivable that two minority stockholders—Cox Communications and Comcast Corporation—were controlling stockholders of At Home Corporation. Cox and Comcast were viewed as a single unit throughout the court's analysis about a transaction in which they allegedly caused At Home

In any event, the same number of directors with alleged disabling ties to 3G were on the 2019 and 2022 Boards. Between the making of the first demand and rejection of the demands, 3G partners Lemann and Telles left the Board, with Behring remaining.[88] The plaintiffs make only the conclusory assertion that two new directors—Joao M. Castro-Neves (who joined the Board in June 2019) and Miguel Patricio (who joined the Board in May 2021)—"were closely related to and not independent of 3G" and "beholden" to it "for their livelihoods."[89]

Notably, though, Castro-Neves was on the Board when Datnoff made his demand in March 2020 and when Mesirov made a supplemental demand in October 2020.[90] And both Castro-Neves and Patricio were on the Board when Felicetti made her demand in October 2021.[91] No other directors who joined the Board post-2019 are alleged to have been interested or lack independence with regard to the demands.

---

to transfer complete control to a third stockholder, AT&T. It was sufficiently pleaded that Cox and Comcast had "significant leverage" over At Home and wielded board-level veto power. *Williamson*, 2006 WL 1586375, at *5-6. Based on a reasonable inference that Cox and Comcast were controlling stockholders, the court sustained a claim that they had breached their fiduciary duties by causing the company to undertake a transaction benefitting them and AT&T with no regard for At Home's other stockholders. *Id.*

[88] Compl ¶¶ 47, 51.

[89] *Id.* ¶ 284; *see also* Kraft Heinz, "Board of Directors," https://ir.kraftheinzcomany.com/company-profile/board-of-directors (last visited July 17, 2024); The Kraft Heinz Company, Sched. 14A (filed with the SEC on Mar. 27, 2020) at 1.

[90] Report 29; *see also id.* at 29 n.54 (noting that Felicetti made a further demand on the full Board on May 7, 2022); *supra* note 89 and accompanying text.

[91] *Id.*; *see supra* note 89 and accompanying text.

## B.    The Board's Good Faith and Due Care

With the disinterestedness and independence of a majority of the Board conceded, "the only issues to be examined are the good faith and reasonableness of its investigation."[92]  The plaintiffs argue that they have sufficiently put these matters in doubt for two reasons.  First, they point to "structural flaws" in the Working Group that they say undermine the Board's independence and good faith in responding to the demands.[93]  Second, they assert that the Working Group's rejection of the demands was based on a grossly negligent and bad faith "flawed process."[94]

Bad faith requires the pleading of particularized allegations that a director's "decision was so far beyond the bounds of reasonable judgment that it seems essentially inexplicable" on any other ground.[95]  A plaintiff must allege that a board "intentionally act[ed] with a purpose other than that of advancing the best interests

---

[92] *Spiegel*, 571 A.2d at 777.

[93] Pls.' Answering Br. 27-36.

[94] *Id.* at 36-57.

[95] *In re J.P. Stevens & Co., Inc. S'holders Litig.*, 542 A.2d 770, 780-81 (Del. Ch. 1988).

20

of the corporation."[96]  The directors must have acted with scienter—either an intent to harm or knowing indifference to the harm caused.[97]

Gross negligence is "conduct that constitutes reckless indifference or actions that are without the bounds of reason."[98]  In the wrongful refusal context, "[t]he gross negligence inquiry focuses on whether the board properly informed itself of material information reasonably available to it before refusing the demand."[99]  The court considers whether the plaintiff has pleaded with particularity that the board failed to investigate or pursued a process so inadequate that it may reasonably infer gross negligence.[100]

---

[96] *Ironworkers*, 2015 WL 2270673, at *27; *see also In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006) ("A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation[.]").

[97] *See, e.g.*, *Ironworkers*, 2015 WL 2270673, at *27 ("For the actions of directors to have been in bad faith, the directors must have acted with scienter, i.e., with a motive to harm, or with indifference to harm that will necessarily result from the challenged decision— here, that decision being rejection of the Plaintiff's demand.").

[98] *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008).

[99] *Andersen*, 2017 WL 218913, at *4.

[100] *See Ironworkers*, 2015 WL 2270673, at *26 (explaining that to demonstrate wrongful refusal, a plaintiff can "plead particularized facts that reasonably imply gross negligence, in that the board acted in an uniformed manner by failing either to investigate the demand at all or in pursuing such an inadequate investigation, in light of the seriousness of the demand, that a court may reasonably infer a breach of the duty of care"); *see also Drachman v. Cukier*, 2021 WL 5045265, at *8 (Del. Ch. Oct. 9, 2021) (concluding that bad faith was adequately alleged where the board did "nothing" to investigate before sending a response that gave the demand the "back of the hand").

21

No well-pleaded facts support a reasonable inference of bad faith or gross negligence. The plaintiffs' assertions about the Working Group's formation and structure are conclusory at best. As to the Working Group's process, the plaintiffs have not made particularized allegations putting the Board's good faith and care in doubt. The Complaint must be dismissed for failure to demonstrate wrongful refusal under Rule 23.1.

### 1. The Alleged "Structural Flaws"

The plaintiffs allege that the Board acted in bad faith by forming a "structurally flawed" Working Group.[101] In their view, the Board should have delegated its decision-making authority over the demands to an independent committee rather than form an administrative Working Group. They also insist that the Board left the Working Group "hopelessly conflicted" when it appointed Pope— a director "with exposure to a substantial likelihood of liability."[102]

These arguments fail for several reasons. The Board that formed the Working Group is concededly unconflicted. It was empowered to decide how to investigate the demands as a matter of business judgment. That disinterested and independent Board was also free to appoint Pope to the Working Group. Even if this choice were

---

[101] Compl. ¶ 279; *id.* ¶ 285; *see also* Pls.' Answering Br. 35-36.

[102] Compl. ¶ 281.

imperfect, it is not fatal. There are no particularized allegations calling into doubt Pope's independence or disinterestedness.

### a. The Working Group's Authority

The plaintiffs allege that the "hopelessly conflicted Board['s]" retention of "ultimate control over whether to sue its members" or 3G "affiliates of its members" indicates the "sham nature" of its process.[103] This theory ignores that the plaintiffs opted to make demands on the Board that formed the Working Group.[104] Having chosen that path, the plaintiffs can no longer argue that the Board was incapable of proceeding impartially. There are also no particularized facts alleged suggesting that the Board became conflicted post-demands such that it could no longer act impartially in responding to them.[105]

There is no set path a board must take in assessing and responding to a litigation demand.[106] The Board was not required to vest the committee with its full decision making authority.[107] It was entitled to decide how to form and empower

---

[103] *Id.* ¶ 285.

[104] The Working Group was formed the month after Datnoff's demand and well before Felicetti's demand. *See supra* note 50; Report 29.

[105] *See supra* notes 83-85 and accompanying text.

[106] *See Levine v. Smith*, 591 A.2d 194, 214 (Del. 1991), *overruled on other grounds by Brehm*, 746 A.2d 244.

[107] *See Andersen*, 2017 WL 218913, at *5 ("Plaintiff's argument that Mattel's investigation was flawed because the board did not form a special committee also fails."); *see also Bresalier v. Good*, 246 F. Supp. 3d 1044, 1055 (D. Del. 2017) (rejecting an argument that

23

the Working Group.  There is no basis for the plaintiffs or this court to second guess that choice.

### b. The Working Group's Membership

The plaintiffs also argue Pope's service on the Working Group indicates that the Board's response to the demands was a "sham."[108]  In their view, Pope's role as Chairman of the Audit Committee left him unable to objectively investigate "the Company's accounting and financial statements or its filings with the SEC."[109]  They believe that the Board should have appointed a director who joined the Board after the relevant period to serve alongside Mulder.[110]

The plaintiffs' position relies on precedent where boards delegated their full decision-making authority to committees, such as special litigation committees.[111]

---

the board should have appointed a special litigation committee instead of a demand review committee).

[108] Compl. ¶ 285; *id.* ¶ 280; *see* Pls.' Answering Br. 35-36.

[109] Compl. ¶ 280.

[110] Compl. ¶ 281; *see* Hr'g Tr. 37-38 (arguing that the Board "had other options who were not even on the [B]oard at the time of the wrongdoing" and were "available to be part of this Working Group process").

[111] *See* Pls.' Answering Br. 29 ("[M]ember independence is paramount in the special litigation committee process."); *e.g.*, *London v. Tyrell*, 2010 WL 877528 (Del. Ch. Mar. 11, 2010); *Lewis v. Fuqua*, 502 A.2d 962 (Del. Ch. 1985); *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917 (Del. Ch. 2003); *see also City of Tamarac Firefighters' Pension Trust Fund v. Corvi*, 2019 WL 549938, at *1-2 (Del. Ch. Feb. 12, 2019) (considering and rejecting allegations that a special committee was interested or lacked independence where it was given the "authority to act on behalf of the Board"); *id.* at 8-9 (observing that the tacit concession doctrine should not be extended to committees with full decision making authority).

In that context, the committee must demonstrate that its independence is "above reproach" because the board is overall unqualified to consider a demand or lawsuit.[112]   Here, however, a different standard applies.   The plaintiffs have acknowledged that the Board was qualified to respond to the demands and have not sufficiently pleaded that the Board became conflicted when its membership changed.

The fact that the plaintiffs made demands does not, of course, mean that the Board's independence and disinterestedness has been conclusively established.[113] Still, Pope's appointment to the Working Group does not give me reason to question the Board's good faith in forming it.   There are no particularized allegations indicating that Pope lacked independence, faced a substantial likelihood of liability for the issues raised in the demands, or was otherwise biased to a degree affecting his judgment.[114]   Pope is not alleged to have benefitted—in any way—from the wrongdoing alleged in the Complaint.   He has no disabling ties to 3G or any purportedly conflicted individual.

---

[112] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1055 (Del. 2004) (quoting *Lewis*, 502 A.2d at 967).

[113] *Scattered Corp.*, 701 A.2d at 74 ("Simply because the composition of the board provides no basis *ex ante* for the stockholder to claim with particularity and consistently with Rule 11 that it is reasonable to doubt that a majority of the board is either interested or not independent, it does not necessarily follow *ex post* that the board in fact acted independently, disinterestedly or with due care in response to the demand.").

[114] The plaintiffs make no argument that Mulder or the Working Group's outside advisors were conflicted.  They also do not argue that any member of the Board was beholden to Pope.

The plaintiffs' sole critique is that Pope was the Audit Committee Chairman during the relevant events.[115] Pope's role alone does not, however, mean that he faces a substantial likelihood of liability for a non-exculpated claim.[116] Delaware courts reject the premise that "membership on the Audit Committee is a sufficient basis to infer the requisite intent."[117]

To show that Pope faced a substantial likelihood of liability for the breach of fiduciary duty claims in the Complaint, the plaintiffs would need to demonstrate bad faith.[118] For their *Malone* claim, they must plead with particularity that Pope knew public statements he disseminated were materially misleading when made.[119] For

---

[115] Pls.' Answering Br. 34-35.

[116] *See* Stachel Aff. Ex. 7 (Kraft Heinz certificate of incorporation) art. VIII(B).

[117] *Wood v. Baum*, 953 A.2d 136, 142 (Del. 2008) (explaining that a director's service on an audit committee was an insufficient basis to infer liability); *see also Rattner v. Bidzos,* 2003 WL 22284323, at *12-13 (Del. Ch. Sept. 30, 2003); *Kraft Heinz*, 2023 WL 2745118, at *8 ("Members of the Audit Committee may have a specific responsibility for oversight of matters related to the allegedly misleading shareholder communications, but it does not follow that they had knowledge of deception or wrongdoing in the dissemination of those communications or the materials they relied on, particularly considering that board members are entitled to rely in good faith on the reports of employees and officers.").

[118] *See McElrath v. Kalanik*, 224 A.3d 982, 991-92 (Del. 2020) (explaining that to identify a non-exculpated claim, a plaintiff must plead that a director was "motivated by an actual intent to do harm," consciously disregarded his duties, or "knew he was so acting" (citation omitted)).

[119] *See Malone v. Brincat*, 722 A.2d 5, 14 (Del. 1998) (explaining that a plaintiff must plead facts showing that a director "knowingly disseminat[ed] materially false information" and was "deliberately misinforming shareholders").

26

their *Caremark* claim, they must sufficiently allege that Pope consciously disregarded a red flag of misconduct.[120] They do neither.

The plaintiffs merely state that Pope attended Board and Audit Committee meetings where the distressed reporting units, trademarks, and brands suffering from impairment risks were discussed with Knopf before 3G's stock sale.[121] Pope purportedly received some unspecified information at these meetings. He also "caused" Kraft Heinz to issue Form 10-Ks in 2017 and 2018 that made disclosures about impairment testing.[122] From that vague premise, the plaintiffs assert that Pope knew Kraft Heinz's impairment testing was ineffective, covered it up, and allowed it to continue.

Pleading that a director "'caused' or 'caused or allowed' the [c]ompany to issue certain statements is not sufficient particularized pleading" under Rule 23.1.[123]

---

[120] *See Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 370 (Del. 2006). The plaintiffs do not plead that Pope utterly failed to cause Kraft Heinz to establish a system of controls. They concede the existence of an Audit Committee and relevant corporate policies. *See TVI Corp. v. Gallagher*, 2013 WL 5809271, at *15-16 (Del. Ch. Oct. 28, 2013) (dismissing a *Caremark* claim where the plaintiffs "acknowledge[d] that the Board maintained an audit committee").

[121] Compl. ¶ 280 ("Pope was present at the Audit Committee Meetings where the distressed reporting units, trademarks, and brands on the fringe of impairment were identified and discussed with . . . Knopf before 3G Capital sold a huge block of stock at artificially inflated prices."); *see* Transmittal Aff. of Carmella P. Keener in Supp. of Pls.' Omnibus Br. in Opp'n to Defs.' Mot. to Dismiss (Dkt. 82) ("Keener Aff.") Ex. 1.

[122] Compl. ¶¶ 168-169.

[123] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 133, n.88 (Del. Ch. 2009); *see also In re Zimmer Biomet Holdings, Inc. Deriv. Litig.*, 2021 WL 3779155 (Del. Ch.

27

Nor is merely alleging that a director served on a committee tasked with overseeing matters within which a corporate trauma occurred.[124] Even if the allegations suggest that Pope understood Kraft Heinz was facing business headwinds or approaching impairment triggers, I cannot reasonably conclude that he knew misconduct was occurring or that Kraft Heinz's public statements were untrue.[125] Any such inference is further undercut by the plaintiffs' acknowledgement that Pope contemporaneously relied on reports of officers and outside advisors.[126]

The limited statements in the Complaint about Pope cannot support an inference that he knowingly issued false statements or allowed misconduct to proceed unabated. There are no particularized allegations that he received information placing him on notice of wrongdoing. Pope's receipt of presentations

Aug. 25, 2021) ("A statement that the documents were signed by the Director Defendants, or that they 'approved' the disclosures and 'caused' or 'consented to' their filing is not—without more—a particularized allegation of fact." (citation omitted)), *aff'd*, 279 A.3d 356 (Del. 2022) (TABLE).

[124] *See Citigroup*, 964 A.2d at 128; *South v. Baker*, 62 A.3d 1, 17 & n.6 (Del. Ch. 2012) ("[A]n allegation that the underlying cause of a corporate trauma falls within the delegated authority of a board committee does not support an inference that the directors on that committee knew of and consciously disregarded the problem." (citation omitted)).

[125] *See Citigroup*, 964 A.2d at 130 ("[T]he mere fact that a company takes on business risk and suffers losses—even catastrophic losses—does not evidence misconduct.").

[126] *See* Compl. ¶¶ 90, 95, 97, 99, 102, 107, 108, 118, 123, 130, 137, 142, 147, 150, 154, 172, 178, 182-83, 186, 189, 245, 296; *see also* 8 *Del. C.* § 141(e); *Graham v. Allis-Chalmers Mfg. Co.*, 188 A.2d 125, 130 (Del. 1963) ("[D]irectors are entitled to rely on the honesty and integrity of their subordinates until something occurs to put them on suspicion that something is wrong.").

about impairment risks or oversight responsibility for Kraft Heinz's financial reporting comes nowhere close to indicating disloyalty. Regardless of whether Pope was the best choice for the Working Group, his involvement is not grounds to second guess the Board's good faith in investigating the demands.[127]

### 2. The Alleged Process Flaws

The plaintiffs next argue that the demands were wrongfully refused because the Working Group's process and conclusions are flawed. They believe that the process was grossly negligent because certain information was not obtained and prior investigatory work was relied upon. They also maintain that the determinations in the Report are contradicted by evidence and common sense, indicating bad faith. Each argument is deficient.[128]

---

[127] The Complaint also brings claims against Pope (and the other individual defendants) for unjust enrichment and contribution and indemnification. *See supra* note 66. Other than Pope's receipt of ordinary director fees and stock awards (Compl. ¶ 51), these claims rest on the same conclusory allegations addressed above. The plaintiffs also seemingly abandoned their argument that Pope faces a substantial likelihood of liability for the federal derivative action. *See* Reply Br. in Supp. of Nominal Def.'s and the Individual Defs.' Mot. to Dismiss Under Rules 23.1 and 12(b)(6) (Dkt. 88) 7; Pls.' Answering Br. 32. It would fail in any event. The federal derivative action was dismissed. Further, Delaware courts reject the notion that directors face a substantial likelihood of liability because they were named defendants in lawsuits or "would be deciding to sue themselves." *Citigroup*, 964 A.2d at 121; *see Aronson*, 473 A.2d at 815 (explaining that naming directors as defendants is insufficient to plead a substantial likelihood of liability).

[128] The plaintiffs' accusations of bad faith and gross negligence are muddled because they argue that matters reflect both bad faith and gross negligence. I have tried to address the allegations in a logical way that considers whether they appear aimed at undermining the directors' care or good faith. It should be understood that none of the plaintiffs' allegations are sufficient to rebut either.

a. Adequacy of the Investigation

The Working Group's process spanned two years. It and its advisors reviewed more than 150,000 Kraft Heinz documents, plus SEC and court filings and other materials.[129] They interviewed 12 people, including current and former Kraft Heinz directors and officers. The Working Group reviewed a 63-page report by AlixPartners on accounting issues related to the $15.4 billion impairment charge.[130] Simpson Thacher also conducted an evaluation of the prior investigation into procurement-related issues, which had been led by Gibson Dunn & Crutcher LLP.[131] Simpson Thacher spent 5,000 hours on the investigation and AlixPartners devoted 1,500 hours to its work.[132] At the end of this process, the Working Group produced a 110-page Report (excluding exhibits) that was accepted by the full Board.[133]

Despite these facts, the plaintiffs argue that the Working Group's process was deficient for three reasons.[134] The Working Group did not request 3G's internal documents.[135] It did not interview the confidential witnesses discussed in the

---

[129] Report 55-57.

[130] Report App'x A.

[131] Report 52.

[132] *Id.* at 4-5.

[133] Stachel Aff. Ex. 4; *see* Compl. ¶ 271.

[134] Pls.' Answering Br. 42-46.

[135] Compl. ¶ 303.

securities class action complaint.[136] And it relied on Gibson Dunn's procurement-related investigation.[137]

Although directors are obligated to act with care when responding to a demand, "there is obviously no prescribed procedure that a board must follow."[138] The Working Group's "choice of people to interview or documents to review is one on which reasonable minds may differ."[139] The critical inquiry is whether the directors neglected to consider material facts that are reasonably available.[140]

According to the Report, the Working Group determined that 3G and affiliated persons lacked material non-public information belonging to Kraft Heinz before the August 2018 stock sale.[141] The focus of a *Brophy* analysis is on the corporation's confidential information, and the Working Group determined from Kraft Heinz's documents that there was no material non-public information at issue.

---

[136] *Id.* ¶ 315.

[137] *Id.* ¶¶ 301-02.

[138] *Levine*, 591 A.2d at 214.

[139] *Mount Moriah Cemetery v. Moritz*, 1991 WL 50149, at *4 (Del. Ch. Apr. 4, 1991), *aff'd*, 599 A.2d 413 (Del. 1991).

[140] *See Brehm*, 746 A.2d at 259 (explaining that "the informational component of the directors' decisionmaking does not mean that the Board must be informed of *every* fact" but that they are "responsible for considering only *material* facts that are *reasonably available*, not those that are immaterial or out of the Board's reasonable reach"); *Andersen*, 2017 WL 218913, at *4 ("The gross negligence inquiry focuses on whether the board properly informed itself of material information reasonably available to it before refusing the demand.").

[141] Report 92-103.

It is unclear why 3G's internal documents were needed to reach this conclusion or why they would have altered the Working Group's findings and recommendations.

As to the confidential witness interviews, there is no basis to conclude that they would have been material rather than cumulative. The plaintiffs aver that the Working Group should have spoken with the 26 confidential witnesses because certain statements from them were used in the securities action complaint. But an investigatory committee is not required to speak to every person with relevant information.[142] The plaintiffs' suggestion that these witnesses had unique material information compared to the dozen witnesses interviewed and tens of thousands of documents reviewed is speculative.[143] There is no factual basis to infer that the interviews would have altered the Working Group's conclusions or the Board's decision to refuse the demands.[144]

---

[142] *See Moritz*, 1991 WL 50149, at *4 ("Inevitably, there will be potential witnesses, documents and other leads that the investigator will decide not to pursue. That decision will not be second guessed by this Court on the showing made here."); *Belendiuk v. Carrión*, 2014 WL 3589500, at *6 (Del. Ch. July 22, 2014) ("This Court repeatedly has held that a stockholder's criticisms regarding the types of documents reviewed or the persons interviewed in connection with an investigation do not rise to the level of gross negligence, because those choices are ones on which reasonable minds may differ.").

[143] Compl. ¶¶ 315-19.

[144] *See Ironworkers*, 2015 WL 2270673, at *26 n.255 (rejecting an argument that a committee was grossly negligent for failing to interview certain individuals where there were no particularized allegations that "information unique to these individuals" would "have changed the Board's determination to refuse the demand, in light of the otherwise exhaustive investigation conducted").

The Working Group's use of Gibson Dunn's prior investigatory work is also not indicative of a defective investigation.[145] According to the plaintiffs, the Working Group's reliance on a "years-old investigation into the issues" suggests that it "was interested only in absolution, not the truth."[146] This theory is undermined by the Report.[147]

Simpson Thacher concluded that Gibson Dunn's process was sufficiently robust that the Working Group could rely on it; the Working Group agreed. Gibson Dunn had collected and reviewed 2.2 million documents from 24 custodians and conducted 105 interviews of 77 current and former Kraft Heinz employees.[148] Simpson Thacher supplemented Gibson Dunn's investigation in several respects, including additional witness interviews and a separate evaluation of the remedial

---

[145] *See Kops v. Hassell*, 2016 WL 7011569, at *4 (Del. Ch. Nov. 30, 2016) (holding that the board was entitled to rely on a prior investigation conducted in response to a previous stockholder demand and rejecting arguments that such reliance implied gross negligence or bad faith by a demand review committee); *see also Gould ex rel. Bank of Am. v. Moynihan*, 275 F. Supp. 3d 487, 496-97 (S.D.N.Y. 2017) (applying Delaware law and concluding that the board "was adequately informed when it refused the Demand" where it "had been responding to significant regulatory investigations and civil lawsuits" and "drew on its existing knowledge developed in the course of responding to related allegations").

[146] Compl. ¶ 321.

[147] Report 52-54.

[148] *Id.* at 52.

measures implemented by the company.[149] This record in no way implies grossly negligence—much less bad faith—by the Working Group.

b.      Reasonableness of the Conclusions

The Report stated that, with the "potential exception" of Pelleissone and Hofmann, there was no evidence showing the individuals and entities named in the demands had violated applicable law.[150] The Working Group determined there was no basis to conclude that material misstatements or omissions were made with scienter in Kraft Heinz's public statements, SEC filings, or consolidated financials.[151] The Working Group found no evidence of wrongdoing concerning the Company's procurement function or the $15.4 billion impairment charge.[152] It identified no evidence "establishing that there are colorable claims relating to insider trading" by 3G.[153] With respect to Pelleissone and Hofmann, it concluded that litigation would not be in Kraft Heinz's best interest based on practical considerations.[154]

---

[149] *Id.* at 54.

[150] *Id.* at 12.

[151] *Id.* at 14-15, 61-76.

[152] *Id.* at 16-18, 77-88.

[153] *Id.* at 91.

[154] *Id.* at 12-14, 63-64, 77-78. It bears noting that neither Pelleissone nor Hofmann were 3G partners.

The plaintiffs take issue with these assessments as incorrect, unsupported, or incredible.[155] But there are no well-pleaded facts contradicting them. "[M]ere disagreement with the [Working Group's] ultimate conclusion, as well as its subsidiary conclusions leading thereto, will be insufficient to raise a reasonable doubt that the Board acted in good faith and on an informed basis."[156]

The plaintiffs' lead argument is that both internal documents and common sense belie the Working Group's finding that 3G lacked material non-public information when it sold stock in August 2018. Much is made of a July 24, 2018 email from a 3G employee to Knopf—an email discussed in the Report.[157] The Working Group found that this email reflects notice of 3G's intention to sell approximately 19 million shares from its Fund IV and requests information from Kraft Heinz in connection with the sale.[158] The plaintiffs read the email as evidencing insider trading because the sender sought Kraft Heinz's valuation using "realistic" assumptions "based on [the] current 2019 view."[159] The plaintiffs say that this statement implies the publicly available information was unrealistic and

---

[155] *See* Pls.' Answering Br. 37-39, 47-50.

[156] *Ironworkers*, 2015 WL 2270673, at *27.

[157] Keener Aff. Ex. 2 (email from M. Romaniero of 3G to D. Knopf and T. Dadon of Kraft Heinz); *see* Pls.' Answering Br. 47; Hr'g Tr. 40-43.

[158] Report 92. The email also references a lockup pertaining to Fund III; the intended sale was for Fund IV. Keener Aff. Ex. 2.

[159] Keener Aff. Ex. 2.

unreliable, requiring 3G to seek out non-public "realistic" information directly from Kraft Heinz.[160]

The plaintiffs' interpretation is strained. The email came at the end of the quarter.[161] It does not express any concern about the reliability of the projections or—more importantly—the impairment risks. Nor does it suggest that the trading defendants learned material information different from what the market knew.[162] It is hardly a smoking gun.

Regardless, it was the Working Group's prerogative to evaluate the document. The email was assessed after the Working Group and its counsel reviewed the circumstances surrounding the sale, including by interviewing Knopf (who received the email) and Behring (who made the information request).[163] "The existence of

---

[160] *See* Hr'g Tr. 41 (plaintiffs' counsel explaining this theory).

[161] Compl. ¶ 172.

[162] *See In re Camping World Hldgs., Inc. S'holder Deriv. Litig.*, 2022 WL 288152, at *9-10 (Del. Ch. Jan. 31, 2022) (explaining that an assessment of materiality requires well-pleaded allegations of a "substantial likelihood" that the information "would have assumed actual significance in the deliberations of a person deciding whether to buy, sell, vote, or tender stock" and that "the context of the supposedly material information, including the information that was known to the market" is relevant (citation omitted)), *aff'd*, 285 A.3d 1204 (Del. 2022); *Tilden v. Cunningham*, 2018 WL 5307706, at *19 (Del. Ch. Oct. 26, 2018) (stating that courts will not credit conclusory allegations that "because [defendants] were on the Board and in management" they "must have obtained some additional, material nonpublic information").

[163] Report 57.

one or a few troubling documents is insufficient" to support an inference of bad faith by the Working Group and Board.[164]

Next, the plaintiffs quarrel with the results of AlixPartner's forensic accounting review.[165] In a report attached as Appendix A to the Working Group's Report, AlixPartners opined that Kraft Heinz did not experience a sustained decline in market capitalization or share price before November 1, 2018 that would have led it to recognize an impairment triggering event.[166] The plaintiffs insist that this analysis is flawed because Kraft Heinz allegedly faced business headwinds and other "potential triggering events" during this period.[167] Conclusory allegations and

---

[164] *Zucker v. Hassell*, 2016 WL 7011351, at *10 (Del. Ch. Nov. 30, 2016). The plaintiffs say that *Zucker* is distinguishable because the committee there was shown the document in question but the directors here relied on counsel. Pls.' Answering Br. 48. This argument is meritless. The Working Group and Board were entitled to rely on Simpson Thacher. *See* 8 *Del. C.* § 141(e). The "informed decision to delegate a task is as much an exercise in business judgment as any other." *Grimes*, 673 A.2d at 1214, *overruled on other grounds by Brehm*, 746 A.2d 244. The email here is also not so "troubling," as in *Zucker*, that I would expect the Working Group to have personally reviewed it.

[165] Compl. ¶¶ 294-95, 306-10.

[166] Report App'x A at 18-22 (stating that there was no sustained decline in share price or market capitalization before November 1, 2018 both in "absolute terms and relive to [Kraft Heinz's] peers"). Although the Complaint alleges other share price declines, it does not allege with particularity that there was a sustained decline both in absolute terms and relative to the company's peers.

[167] Pls.' Answering Br. 52; *see also id.* at 51-53.

suppositions cannot, however, put in doubt the Board's good faith in weighing the analysis of its independent advisor.[168]

The plaintiffs further attack the Working Group for giving short shrift to the opinion denying a motion to dismiss the securities class action in the Northern District of Illinois. Twice, though, the Report states that the Working Group carefully considered the pleadings in that case while remaining mindful that the operative standard in the opinion required the federal court to treat allegations as true.[169] As the report correctly noted, a different benchmark guided the Working Group's efforts. The Working Group was not accepting allegations but charged with making a fact-based inquiry into whether pursuing litigation would be in the best interest of Kraft Heinz and its stockholders.[170]

---

[168] *Ironworkers*, 2015 WL 2270673, at *30 ("[T]hat the Plaintiff disagrees with the Committee's conclusions is simply insufficient to raise a reasonable doubt that the Board's adoption of the Committee's recommendation was made in good faith, and the Plaintiff has made no other proffer as to why the decision to decline to pursue litigation on this claim must be in an interest other than that of the corporation.").

[169] Report 10-11, 16.

[170] *Id.* at 11. The argument that the Working group "downplay[ed] the SEC's Order," in which accounting improprieties were found, is similarly baseless. Pls.' Answering Br. 5. The Report explains that the Working Group considered all finance and gatekeeping personnel in addition to Hofmann and Pelleissone. *Id.* at 79-80. It further details the Working Group's consideration of the facts of the misconduct and the company's remedial measures. *Id.* at 77-82.

Finally, the plaintiffs disagree with the Working Group's conclusion that five practical factors cut against litigation.[171]  These factors are: (1) that the costs of litigation would outweigh any potential recovery from the demands' targets, especially considering advancement and indemnification obligations; (2) the exculpatory provision in the company's charter; (3) the diversion of key personnel that would impede the business, especially given existing remedial efforts; (4) the risk of undermining the company's defenses in pending litigation; and (5) unwarranted reputational harm to Kraft Heinz.[172]  The Working Group weighed these factors individually and collectively in concluding that litigation was unadvisable, including against Pelleissone and Hofmann.[173]  The factors were not assessed in a vacuum but in view of the Working Group's findings on the merits.

The plaintiffs' insistence that I reject these considerations as "unpersuasive" may be the worst example of their desire to substitute their subjective views for the Board's.[174]  "It is within the bounds of business judgment" for a board to refuse a litigation demand after concluding "that a lawsuit, even if legitimate, would be

---

[171] Pls.' Answering Br. 54-57.

[172] Report 107-110.

[173] *Id.*

[174] *See* Pls.' Answering Br. 54.

excessively costly to the corporation or harm its long-term strategic interests."[175] Disagreement does not plead bad faith.

*       *       *

Viewed together, the plaintiffs' allegations fail to meet the Rule 23.1 standard for pleading wrongful refusal. The fact of their demands concedes that the Board *ex ante* could consider them impartially. There are no well-pleaded facts calling into question the Board's disinterestedness or independence *ex post*. Arguments about "structural flaws" in the Working Group fail on that basis, and because Pope did not face a substantial likelihood of liability.

The plaintiffs' challenges to the Working Group's process and Board's response to the demands are similarly lacking. The Working Group undertook a thorough investigation and reached conclusions based upon evidence and independent advice. There are no well-pleaded facts creating a reasonable doubt that the Board acted in good faith and with due care when it rejected the demands.

---

[175] *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 986 (Del. Ch. 2007); *see also In re AbbVie Inc. S'holder Deriv. Litig.*, 2015 WL 4464505, at *6 (Del. Ch. July 21, 2015) (observing that Delaware courts have "long recognized that derivative litigation is burdensome to companies, by way of the direct costs of the litigation, including advancement and indemnification obligations, as well as indirect costs, such as distraction to management and the board, and possible detriment to employee morale" (citation omitted)); *Busch ex rel. Richardson Elecs., Ltd. v. Richardson*, 2018 WL 5970776 (Del. Ch. Nov. 14, 2018) (holding that a complaint failed to plead bad faith, in part, because the special committee concluded that it was "unclear that the Company was harmed," that an exculpatory charter provision might apply, and that the "potential costs of bringing any lawsuit outweigh the potential benefits").

## III.   CONCLUSION

The plaintiffs have failed to allege that the Kraft Heinz Board wrongfully refused their demands. The defendants' Rule 23.1 motion to dismiss is granted and the Complaint is dismissed with prejudice. As a result, the Rule 12(b)(6) motion to dismiss is moot.